# QUICK BEAR *v.* LEUPP.

# LEUPP *v.* QUICK BEAR.

INDIANS; SECTARIAN SCHOOLS; STATUTES.

1. Money appropriated by Congress to carry out the obligations of the Sioux treaty of 1868 (15 Stat. at L. 635), and money appropriated under the act of March 2, 1889 (25 Stat. at L. 888, chap. 405), to pay for land relinquished by the Indians, although remaining in the Treasury, to be expended for the benefit of the Indians under direction of the Secretary of the Interior, is not public money, but belongs to the Indians, and is to be expended by the Secretary as such; and limitations and restrictions do not apply to it which have been placed by Congress upon the expenditure of public money by the Secretary for the benefit of the Indians.

2. The Secretary of the Interior has the power, under the treaty of 1868 with the Sioux Indians (15 Stat. at L. 635) and acts of Congress appropriating money to carry out its obligations, and the act of Congress of March 2, 1889 (25 Stat. at L. 888, chap. 405), creating a fund for the use of those Indians in consideration of their relinquishment of certain lands, to renew an annual contract with a sectarian school for the care, maintenance, and education of a specified number of Indians of the Sioux tribe, over the protest of other members of the tribe, and to set apart from the treaty and trust funds so created sufficient money to carry out such contract; as the declaration in the Indian appropriation acts of June 10, 1896, and June 7, 1897 (29 Stat. at L. p. 345, chap. 398, and 30 Stat. at L. 79, chap. 3), that it is the settled policy of the government to hereafter make no appropriation whatever for education in any sectarian school, if intended to announce a fixed policy, applies to gratuitous appropriations of public money for Indian educational purposes, and not to appropriations from the Sioux treaty and trust funds previously created.

Nos. 1786 and 1787. Submitted May 27, 1907. Decided November 29, 1907.

HEARING on an appeal and cross appeal from a decree of the Supreme Court of the District of Columbia, sitting as an equity court, enjoining the application of a certain fund, and refusing to enjoin the application of another fund to a contract for the education of Indians. *Reversed in so far as it granted the injunction, and affirmed in so far as it denied the injunction.*

The facts are stated in the opinion.

*Mr. Samuel M. Brosius* and *Mr. Charles C. Binney* for Quick Bear and others.

*Mr. Daniel W. Baker,* United States Attorney for the District of Columbia, *Mr. Stuart McNamara,* Assistant, and *Mr. Edgar H. Gans,* Special Assistant Attorney, for the Commissioner of Indian Affairs and others.

Mr. Justice WRIGHT, of the Supreme Court of the District of Columbia, who sat with the Court in the hearing in the place of Mr. Justice Robb, delivered the opinion of the Court:

For many years prior to 1905 the government of the United States had made, with mission schools of various denominations, annual contracts for the education of Indian children. Amongst these was a sectarian school maintained on the Rosebud reservation by the Bureau of Catholic Indian Missions, a corporation of the State of Maryland.

In June, 1905, this bureau advised the Commissioner of Indian Affairs that it was prepared to care for and to educate Indian pupils during the fiscal year 1906, and requested a renewal of its contract of the preceding year on the same terms and conditions; in March, 1906, 212 members of the Sioux tribe who desired that their children be educated in a Catholic school petitioned the respondents to that end, and particularly that the contract requested by the bureau be entered into on their behalves; others of the tribe objected and protested; the Commissioner of Indian Affairs made a contract with the Bureau

of Catholic Indian Missions for the care, maintenance, and education during the year 1906 of 250 Sioux pupils at St. Francis Mission School on the Rosebud reservation at the cost of $27,000: The Secretary of the Interior approved the contract, and there were set apart for payment the sums of $24,000 from the "Sioux treaty fund," and $3,000 from the income of the "Sioux trust fund;" the complainants on behalf of themselves and of all the members of the Sioux tribe instituted this suit to enjoin the application of the money to the purpose proposed; the learned justice of the supreme court of the District of Columbia, who heard the matter below, was of opinion that an injunction should go against the expenditure of the $24,000 from the "treaty fund," and be denied as to the $3,000 from the "trust fund," and it was so decreed; both parties have appealed.

The complainants put forward that at the time of the contract the Secretary of the Interior had been deprived by certain legislative expressions (found for the most part in the annual Indian appropriation acts) of all power to make or to authorize a contract for the education of any Indian pupil in any sectarian school; and this is the question.

The necessary outcome of the case will evolve itself from an understanding of the nature and character of the "funds" involved and an analysis of the appropriation acts concerned, more readily than it can be made to appear from a discussion of the various arguments put forward by the respective parties.

### SIOUX TREATY FUND.

By the Sioux treaty of 1868 (15 Stat. at L. 635) the United States agreed that for a term of twenty years they would provide for every thirty children of the Sioux tribe a house and a teacher competent to teach the elementary branches of an English education. In 1877 (19 Stat. at L. 254, 255, chap. 72) the United States further agreed to furnish to the Sioux "schools and instruction in mechanical and agricultural arts as provided for by the treaty of 1868."

by the act of March 2, 1889 (25 Stat. at L. 894, chap. 405) that article of the treaty of 1868 which provided for schools and for education was continued in force for a second term of twenty years. In pursuance and discharge of the obligations created by this treaty, the Indian appropriation act of 1905 (33 Stat. at L. 1048-1055, chap. 1479), appropriating for the fiscal year 1906, provided, amongst other things:

"For subsistence of the Sioux, and for purposes of their civilization, as per agreement ratified by act of Congress approved February twenty-eight, eighteen hundred and seventy-seven, seven hundred thousand dollars."

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"For support and maintenance of day and industrial schools, including erection and repairs of school buildings, in accordance with article seven of the treaty of April twenty-ninth, eighteen hundred and sixty-eight, which article is continued in force for twenty years by section seventeen of the act of March second, eighteen hundred and eighty-nine, two hundred and twenty-five thousand dollars."

The fund thus set apart for fulfilment of treaty obligations is the "Sioux treaty fund," out of which the $24,000, *supra,* has been set apart. In this connection it is appropriate to observe that, of the tribal income applicable to education, the proportion for application amongst the 212 petitioners was $33,550.35 (Rec. p. 28),—a sum in excess of the $27,000 involved by the contract at bar.

### SIOUX TRUST FUND.

In 1889 (25 Stat. at L. 888-895, chap. 405), in consideration of the relinquishment of the Indian title to lands in Dakota, and for other reasons, Congress provided "there shall be set apart, out of any money in the Treasury not otherwise appropriated, the sum of three millions of dollars, which said sum shall be deposited in the Treasury of the United States to the credit of the Sioux Nation of Indians as a permanent fund, the interest of which, at five per centum per annum, shall be ap-

propriated, under the direction of the Secretary of the Interior, to the use of the Indians, etc."

This is the "Sioux trust fund," out of the income of which the $3,000, *supra,* has been set apart.

With respect to each and to both of these funds, it is to be observed that their creation by Congress has made public money Indian money; in one instance Congress has paid a treaty debt, in the other paid a debt for lands, and the like; the money has changed owners; what had been money of the public in the Treasury of the United States is now money of the Indians in the Treasury. So that in its expenditure the Secretary of the Interior is laying out money of the Sioux tribe of Indians, not money to which the public has any longer even the most slender claim of title or proprietorship. This distinction is vital to the case; because if Congress has laid upon the Secretary a limitation or restriction concerning only the purposes to which money of the public may be applied, such a limitation cannot readily have application to money of the Indians.

Further, it is to be recognized that the United States, not satisfied that its moral duty of promoting the civilization and education of Indians was fully discharged by according to them the mere benefits to which it was bound and obligated by the Sioux treaty of 1868, at once set out upon a broader and more generous policy,—that of expending, in addition to what the treaty required it to expend, sums for the advancement of Indian education which it was not required by any law or any treaty to expend.

In 1870 (16 Stat. at L. 335, 359, chap. 296), entirely aside from treaty obligations, was appropriated $100,000 "for the support of industrial and other schools among the Indian tribes not otherwise provided for, to be expended under the direction of the Secretary of the Interior."

Appropriations of this nature have continued until the present, and contract have been annually made by the Secretary with mission schools of various denominations, payable out of such gratuitous appropriations. So far as tribes having treaty stipulations were concerned, annual contracts might be and have

been paid in part out of "treaty funds;" but respecting education for non-treaty tribes, education under annual contracts, and all other education, must be paid for from the gratuitous appropriations, or not at all; there was no other money.

These gratuitous appropriations are in no wise a disposition of Indian funds for Indian education, but are clear devotions of public money to the cause of Indian education, gratis.

We propose now to point out that in each appropriation act involved in the complainant's position, Congress has not only fulfilled in detail the several treaty obligations relating to education, but also has made a distinct and separate appropriation of the other nature; an appropriation to which it was not obliged, that it need not have made, a gratuitous appropriation of public money to advance the cause of Indian education; and it seems to us that the outcome of the matter will then begin to appear clear.

It is agreed that prior to 1895 the Secretary's power to contract with sectarian schools for Indian education existed; but, opposition to these contracts having developed, the Indian appropriation act of 1894 provided [28 Stat. at L. 311, chap. 290] : "That the expenditure of the money appropriated for school purposes under this act shall be at all times under the supervision and direction of the Commissioner of Indian Affairs, and in all respects in conformity with such conditions, rules, and regulations as to the conduct and methods of instruction and expenditure of money as may, from time to time, be prescribed by him, subject to the approval of the Secretary of the Interior.

"Provided, That the Secretary of the Interior is hereby directed to inquire into and investigate the propriety of discontinuing contract schools, and whether, in his judgment, the same can be done without detriment to the education of the Indian children, and that he submit to Congress, at the next session, the result of such investigation, including an estimate of the additional cost, if any, of substituting government schools for contract schools, together with such recommendations as he may deem proper."

The Secretary reported, recommending that contract schools "should be decreased at the rate of not less than 20 per cent a year."

The Indian appropriation act of 1895 (28 Stat. at L. 888, chap. 188) deals with and provides for many subjects, under separate and appropriate headings. Upon page 879 appears the heading, "Fulfilling Treaty Stipulations with, and Support of, Indian Tribes;" and under that particular heading, amongst other items, is the following:

"For support and maintenance of day and industrial schools, including purchase, erection, and repairs of school buildings, in accordance with article seven of the treaty of April twenty-ninth, eighteen hundred and sixty-eight, which article is continued in force for twenty years by section seventeen of the act of March second, eighteen hundred and eighty-nine, seventy-five thousand dollars."

Upon page 903, some thirty pages removed from the first, appears the distinct heading "Support of Schools," and there-under is found:

"For support of Indian day and industrial schools, and for other educational purposes,  *  *  *  one million one hundred and sixty-four thousand three hundred and fifty dollars, *  *  *  *Provided,* That the Secretary of the Interior shall make contracts, but only with present contract schools, for the education of Indian pupils during the fiscal year ending June, thirtieth, eighteen hundred and ninety-six, to an extent not exceeding eighty per centum of the amount so used for the fiscal year eighteen hundred and ninety-five; and the government shall, as early as practicable, make provision for the education of Indian children in government schools."

In the Indian appropriation act of 1896, under the heading "Fulfilling Treaty Stipulations with, and Support of, Indian Tribes" (29 Stat. at L. 333, 334, chap. 398), appear the items:

"For subsistence of the Sioux and for purposes of their civilization as per agreement  *  *  *  one million dollars," and—

"For support and maintenance of day and industrial schools, including purchase, erection, and repairs of school buildings,

in accordance with article seven of the treaty  \*   \*   \*   twenty five thousand dollars."

On page 345, again appears the same distinct heading, "Support of Schools," and under it:

"For support of Indian day and industrial schools, and for other educational purposes not hereinafter provided for  \*   \*   \* one million two hundred and thirty-five thousand dollars.  \* \* \* And it is hereby declared to be the settled policy of the government to hereafter make no appropriation whatever for education in any sectarian school;

"Provided, That the Secretary of the Interior may make contracts with contract schools, apportioning as near as may be the amount so contracted for among schools of various denominations for the education of Indian pupils during fiscal year eighteen hundred and ninety-seven, but shall only make such contracts at places where non-sectarian schools ˙cannot be provided for such Indian children, and to an amount not exceeding fifty per centum of the amount so used for the fiscal year eighteen hundred and ninety-five."

Following on pp. 333, 334 are twenty-one distinct items specifically providing for as many non-sectarian schools, and one for a sectarian, to an aggregate of $920,965.

The appropriation act of 1897 (30 Stat. at L. 66, 79, chap. 3), presents the two distinct headings as in the act of 1896. Under "Fulfilling Treaty Stipulations" appear the items which are necessary to fulfilment, including those for schools and education, and under "Support of Schools" appears:

"For support of Indian day and industrial schools, and for other educational purposes not hereinafter provided for, \* \* \* $1,200,000, \* \* \* and it is hereby declared to be the settled policy of the government to hereafter make no appropriation whatever for education in any sectarian school: Provided, That the Secretary of the Interior may make contracts with contract schools, apportioning as near as may be the amount so contracted for among schools of various denominations for the education of Indian pupils during the fiscal year eighteen hundred and ninety-eight, but shall only make such contracts

at places where non-sectarian schools cannot be provided for such Indian children, and to an amount not exceeding forty per centum of the amount so used for the fiscal year eighteen hundred and ninety-five————."

Thereafter, as in the act of 1896, follow specific provisions for schools to the number of twenty-five, including the one sectarian school, in the aggregate sum of $1,162,771.30. Let it be remembered that all appropriations under the heading "Support of Schools" are the gratuitous, as for convenience, we have before designated them.

The act of 1898 (30 Stat. at L. chap. 545), carries, on page 575, the "Fulfilling Treaty Stipulations," heading, together with its items, and on page 587, "Support of Schools."

"For support of Indian day and industrial schools, and for other educational purposes not hereinafter provided for * * * $1,100,000. * * * Provided, That the Secretary of the Interior may make contracts with contract schools, apportioning as near as may be the amount so contracted for among schools of various denominations for the education of Indian pupils during the fiscal year 1899, but shall only make such contracts at places where non-sectarian schools cannot be provided for such Indian children, and to an amount not exceeding thirty per centum of the amount so used for the fiscal year eighteen hundred and ninety-five."

The appropriations for school buildings and for the support of particular schools were substantially the same as in the act of 1896.

The act of 1899 (30 Stat. at L. chap. 324) carries the two headings, the first on p. 927, the second on p. 942, as follows: "Support of Schools." "For support of Indian day and industrial schools, and for other educational purposes not hereinafter provided for, * * * $1,100,000, * * * Provided, That the Secretary of the Interior may make contracts with contract schools, apportioning as near as may be the amount so contracted for among schools of various denominations for the education of Indian pupils during the fiscal year 1900, but shall only make such contracts at places where nonsectarian schools

cannot be provided for such Indian children, and to an amount not exceeding fifteen per centum of the amount so used for the fiscal year eighteen hundred and ninety-five, the same to be divided proportionately among the said several contract schools, this being the final appropriation for sectarian schools."

The act of 1900 (31 Stat. at L. chap. 598), at pages 225 and 242, carries the same two distinct headings, the second, "Support of Schools." "For support of Indian day and industrial schools and for other educational purposes not hereinafter provided for, $1,200,000,"—followed by the specific appropriations for particular schools, none of which is sectarian.

Such is the legislation upon which the position of the complainants depends. The respondents claim that the restrictions and limitations, being found only in connection with the general item under the heading "Support of Schools," apply only to the gratuitous appropriation carried by that item, and not to items found under the distinct heading "Fulfilling Treaty Stipulations." While we have neither been pointed to, nor have we come upon, anything in the books which reaches the particular question, yet all the reasons that seem forecful draw our minds toward the latter contention.

As heretofore pointed out, the appropriations found under the heading "Support of Schools" are the gratuitous appropriations of public money, appropriations primarily devoted to the cause of Indian education; the items under the other heading are obligatory appropriations, primarily devoted to the payment of contractual obligations due the Indians, and only secondarily applied to education by him whom Congress has selected to dispense the trust.

While we, of course, recognize the continuing power of Congress to legislate concerning appropriations for Indians, yet in the absence of further legislation concerning the particular funds involved at bar, the situation may be paralleled by conceiving an instance of the education of a *cestui que trust* through application by the trustee of a trust fund created for that purpose. Once a trust fund be created and its use declared, the trustee is but the medium for its application in the particular

manner; it is not his function to attach limitations or restrictions of his own; if he be so beneficent as to contribute of his own personal funds to the same end, this he may do under any limitations or conditions that please him; but it is not to be said that they attach also to the trust fund; nor is it likely for him to intend that they should. Under the existing legislation the position of the United States with respect to the Indian "funds" is practically that of a trustee; with respect to the gratuitous appropriations for "Support of Schools," that of a voluntary donor; so that it may well be that a limitation can attach to the use of the gift of money without attaching to the trust money.

This difference in the nature and character of the two funds was sufficient not only to cause Congress to provide for them separately, although ultimately they were to be expended to the same end, education, but also to entitle them separately, differently, and distinctly. This consideration is significant, and its significance must be recognized; it establishes that Congress regarded treaty obligations as distinct from school gratuities. If this be accurate, then it is likely that a restriction attached to the dispostion of the gratuity, found only in juxtaposition with the very words creating the gratuity, was intended to apply only to the gratuity.

It is argued by the complainants that the provision, "and it is hereby declared to be the settled policy of the government to hereafter make no appropriation whatever for education in any sectarian school," found in the acts of 1896 and 1897, is a distinct declaration of a governmental policy which controls the action of the Secretary as thoroughly as would a direct legislative prohibition. If not impossible, it is at least difficult to accord to this phraseology the effect of a declaration of permanent policy, in view of the consideration that the so-called policy announced in one year is reversed the next by directly appropriating for sectarian schools, by expressly authorizing the Secretary to contract with them, and by specifically providing for at least one such, as the succeeding appropriation provides. Although the act of 1896 declares it to be the "settled policy of

the government to hereafter make no appropriation whatever for education in any sectarian school," yet such appropriations were, nevertheless, made in 1897; and although the act of 1897 declares a policy in identical language with that of 1896, yet the act of 1898 again overrides by declaration by again appropriating for sectarian schools. If the declaration of 1896 was then intended as announcing a permanent policy to control the future, Congress in 1897, in its wisdom, saw the necessity of departing from it, and wiped it out by appropriating in that year; and if the declaration of 1897 was currently intended as announcing a permanent policy for the future, it in turn was wiped out by appropriating in 1898; so that, as the matter appears, these declarations both stand nullified; and there remains nothing declarative of policy save in the act of 1898 the expression, "this being the final appropriation for sectarian schools."

If these acts be all taken together, it is perfectly manifest that Congress either intended in each year a permanent policy, and deliberately and understandingly postponed it the next; or, what is more likely, that Congress never intended that the policy proclaimed should become operative or effective until after the appropriation of 1898. And by providing in 1896, in connection with the gratuitous appropriation, that the Secretary might expend 80 per cent of the sum spent in 1895; by providing in 1897, in connection with the gratuitous appropriation, that he might expend 50 per cent of that sum; by providing in 1898, in connection with the gratuitous appropriation, that he might expend 40 per cent; in 1898 30 per cent; 1899 15 per cent, "this being the final appropriation for sectarian schools," thus gradually eliminating, in connection with the gratuity, what he was directly authorized to expend out of the gratuity,—it seems equally manifest that Congress considered the limitation as reaching only to the gratuity.

But for the sake of the argument let it be assumed that the language quoted does announce a definite, fixed, and permanent policy; yet what manner of policy is it that is declared? Is it the policy of depriving a religious Indian of the liberty of educating his children in a school of his own sect, at the cost of

his own money? Or is it the policy of declining to educate an Indian in religious schools gratuitously, at the cost of public donations, which are not his and to which he has no claim as matter of right?

Well may it be said that as to national voluntary contributions out of the public funds to the cause of Indian education the taxpayers of the United States, who are adherents to divers creeds and to none, may claim to be consulted. The injustice to people of one creed in having their money applied to the encouragement and strengthening of schools which teach another creed, or in the farming out by the government of its education of Indians to a particular sect, is manifest, and doubtless impressed Congress with a determination that whatever gratuitous education it afforded should not be in creeds, nor paid for to this, that, or the other sect, as such. But the philanthrophy and sense of justice of the same taxpayer is sufficient to enable him ungrudgingly to accord to the Indian the same right and privilege of free choice of schools that he would accord to his neighbor, so long as the money which pays is no longer that of the taxpayer, but gotten to be that of the other.

The first amendment to the Constitution, by the clause, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof," has shackled the hands of legislation against aid or hindrance to creeds and faiths; so be it that they live and flourish, die or wither; they go untouched, unmoved, unstirred by law; against them it speaks not, nor in their favor; in their field each human creature stands unlawed,—a sovereign, supreme,—to turn which way he will; not only the white and black, but the red man as well; to prohibit an Indian from a particular faith, or from rearing his children in its schools is as far outside the law as in case of a Caucasian; and this is the result, if Indian education in a sectarian school of his own choice, paid for by his own money, is to be prohibited and the right denied. The "treaty" and "trust" moneys are the only moneys that the Indians can lay claim to as matter of right; the only sums on which they are entitled to rely as theirs for education; and while these moneys are not

delivered to them in hand, yet the money must not only be provided, but be expended, for their benefit and in part for their education. It seems inconceivable that Congress shall have intended to prohibit them from receiving religious education at their own cost, if they desire it; such an intent would be one to "prohibit the free exercise of religion" amongst the Indians; and such would be the effect of the construction for which the complainants contend.

We are therefore of the opinion that the so-called declaration of policy, the limitations and restrictions found in the various appropriation acts under the title "Support of Schools," concern only moneys appropriated under that particular title,—that is to say, the gratuitous appropriations of public money to the cause of Indian education,—and have nothing to do with the expenditure of the Indian "treaty fund," nor with the proceeds of the Indian "trust fund."

All parties agree that between the two "funds" there is no distinction so far as the effort of the complainants' bill is concerned; nor does any distinction occur to us in this regard. The result of the case will therefore be the same respecting each. The decree is affirmed in so far as it denied an injunction respecting the income of the trust fund; in so far as it enjoined the payment from the "treaty fund" it must be reversed, and the cause is remanded, with directions to dismiss the bill at the cost of the complainants, and it is so ordered.        *Reversed.*

A writ of error to the Supreme Court of the United States was allowed December 13, 1907.